MORRISON, *Appellant*, v. JUDEN.

Division Two, June 28, 1898.

1. **Conveyancing:** UNRECORDED DEED: VALIDITY. Until recorded a deed has no validity save as between the maker and the grantee and such persons as have actual notice thereof.

2. ———: ———: ACTUAL NOTICE. Actual notice of the existence of a deed does not mean direct evidence that the subsequent purchaser actually knew the deed was in existence; but any proper evidence tending to show it, facts and circumstances coming to his knowledge that would put a man of ordinary prudence on his inquiry, will suffice.

3. ———: ———: ———: CASE REVIEWED. The facts of this case are reviewed under the guide of the meaning of "actual notice" and the conclusion reached that the defendant had no actual notice of the prior purchase by plaintiff.

4. ———: ACTUAL NOTICE: STATEMENT BY STRANGER. A statement by a stranger to the title, unauthorized to speak by the grantee of a former deed, and not growing out of the transaction, can not be considered as a suggestion of actual notice.

Morrison v. Juden.

5. ————: PRIOR RECORD: DEED TO WIFE TO AVOID PROSECUTION. The plaintiff's husband, being the owner of the property in controversy, in order to avoid prosecution for renting a house to be used as a brothel, deeded it to a bawd, and then caused her to deed it to his wife, who either at his request or negligently kept the deed from record till the prosecution had ceased, and before her deed was recorded the defendant, without any knowledge of the deed to plaintiff, secured a deed from the same bawd and put it of record. *Held*, that plaintiff could not recover.

*Appeal from Cape Girardeau Circuit Court.*—HON. HENRY C. RILEY, Judge.

AFFIRMED;

*Frank E. Burrough* and *W. H. Miller* for appellant.

(1) The burden of proof to show innocence of purchaser rests on respondent. *Holdsworth v. Shannon,* 113 Mo. 508. (2) Respondent's defenses are inconsistent, to wit: *First,* "Morrison and his wife have committed a fraud upon the public, therefore, I can commit a fraud;" *second,* I am an innocent purchaser without notice. *Long v. Long,* 112 Mo. 11; *Brown v. Bowen,* 90 Mo. 186. (3) Notice need not be direct or positive; anything to put a prudent man on inquiry, is sufficient. *Swisher v. Sensenderfer,* 84 Mo. 104; *Sensenderfer v. Kemp,* 83 Mo. 581; *Sharp v. Cheatham,* 88 Mo. 498; *Maupin v. Emmons,* 47 Mo. 304. (4) It is the payment of the consideration which raises an equity which invalidates the prior unrecorded deed. *Aubuchon v. Bender,* 44 Mo. 560, 564. (5) True, one already negotiating is not to be swayed by mere rumor. But, in case here, the very statement which inspired his act (Kimmel's) contains notice to Juden and he is bound. 2 Pomeroy's Eq., sec. 597. (6) Inadequacy of price is

sometimes sufficient to put one on inquiry. 2 Pomeroy's Eq., sec. 600; *Hoppin v. Doty*, 25 Wis. 573; *Eck v. Hatcher*, 58 Mo. 235. (7) When a contract can not be accounted for, or except on fraud or imposition, it will be set aside though no fraud be proven. *Dickson v. Kempinsky*, 96 Mo. 252; 2 Pomeroy's Eq., sec. 826.

*T. D. Hines* and *R. L. Wilson* for respondent.

(1) If appellant's deed be void because it is a contract *contra bonos mores*, then actual notice to defendant of the existence of her deed avails her nothing as she has no standing in a court of equity. The law will leave her and hers where it finds her. "Not for defendant's sake, but for the law's sake and that only." It was such a contract. *Attway v. Bank*, 93 Mo. 492; Bishop on Con., secs. 505, 506, 507 and 471. (2) It matters not whether appellant was cognizant of the guilty purpose of her husband or not. He was her agent in these transactions and his knowledge will be imputed to her. The guilty knowledge of the agent affects the principal, not only of the facts received during the agency, but also those received so shortly before as to raise the presumption that the knowledge remained in the mind of the agent until the agency began. *Chouteau v. Allen*, 70 Mo. 290; Wade on Notice [Ed. 1878], sec. 677; *George v. Railroad*, 40 Mo. App. 446; *State ex rel. v. Littington*, 51 Mo. App. 257. (3) Appellant could not enforce her rights against Mary Fisher; neither can she against respondent, although he holds under a quitclaim deed. *Munson v. Ensor*, 94 Mo. 504; *Fox v. Holt*, 74 Mo. 315. (4) Our registry act provides: "No such instrument in writing shall be valid, except between the parties thereto, and such as have actual notice therof, until the same shall be deposited with the recorder for record." R. S. 1889, sec. 2420; Wade

on Notice [Ed. 1878], sec. 29; 2 Pomeroy's Eq. [Ed. 1881], sec. 692; 2 Bouvier's Law Dict., p. 236; Snell's Prin. of Eq. [Ed. 1885], p. 35; Jones on Mort. [2 Ed.], secs. 579 and 580; *Aubuchon v. Berber*, 44 Mo. 564; *Draude v. Mfg. Co.*, 9 Mo. App. 253; *Beattie v. Butler*, 21 Mo. 321. Juden is a purchaser for value. Bishop on Con., secs. 43–45; 2 Pomeroy's Eq. [Ed. 1881], secs. 746 and 747; Martindale on Conv., sec. 284.

GANTT, P. J.—Plaintiff brings this suit in equity to divest defendant of the title to a certain lot in the city of Cape Girardeau and vest it in herself, and to cancel a deed to the same from one Mary Fisher to defendant. Plaintiff states that she is the owner of lot 27, range A in Cape Girardeau; that she obtained for value a deed from said Mary Fisher to said lot on April 23, 1894, but carelessly and inadvertently omitted to file the same for record in the land records of Cape Girardeau county; that defendant on June 8, 1894, by means of false and fraudulent pretenses, obtained from said Mary Fisher a quitclaim deed for the alleged consideration of $25, and recorded the same on June 9, 1894; that at said time said Mary Fisher was unable to read and write, ignorant and easily imposed upon; that defendant represented to said Mary Fisher that he and his associates were representing plaintiff in procuring said deed; that at the time defendant knew of plaintiff's prior claim of title or sufficient facts to put him on inquiry; that defendant was not an innocent purchaser for value and without notice and prays his deed may be canceled.

Defendant's answer contains three counts. *First*, a general denial; *second*, "for another and further defense, defendant says that one James M. Morrison is

and was the husband of plaintiff, Ida A. Morrison. That on the —— of April, 1894, James M. Morrison was the owner in fee simple of the lot described in plaintiff's bill and was then renting a house situated on said lot to Mary Fisher for the purpose of keeping there a common brothel or bawdy house. That Mary Fisher was then a bawd and did set up then and there a bawdy house, and keep the same open, against public morals and decency, and in violation of the laws of Missouri and the ordinances of the city of Cape Girardeau. That for said violation of said city ordinances James M. Morrison was, on affidavit filed on the 21st day of April, 1894, prosecuted in the recorder's court, a court of competent jurisdiction, under said ordinance, by the city of Cape Girardeau for such illegal renting of said house to Mary Fisher to be used for a bawdy house. That under the ordinances of the city of Cape Girardeau, the renting a house in said city by the owner thereof to another to be used for the purpose of keeping a bawdy house therein was, and is, a misdemeanor, and punishable by fine, and, in default of payment, imprisonment in the city calaboose. That to escape and evade the just penalty for the violation of said municipal law, defeat the said prosecution and against public morals and public policy, James M. Morrison, Mary Fisher and plaintiff, by her agent, the said James M. Morrison, entered into an agreement and conspiracy, to the effect that said lot should be by said Morrison and wife conveyed to Mary Fisher, the then keeper of said bawdy house, so as to give Mary Fisher an apparent ownership of said realty, and to be secretly reconveyed by Mary Fisher to Ida Morrison, the deed of reconveyance to be fraudulently withheld from the said records of said county, so that its existence would not be known to the public until all

prosecution was ended.   That said illegal and immoral contract and agreement was fully carried out by said parties, by James M. Morrison and his wife executing and delivering to Mary Fisher a good and sufficient deed to said lot, which deed was filed for record in the recorder's office of said county on April 24th, 1894, and duly recorded in deed book 28, at page 175; and by Mary Fisher secretly executing to Ida A. Morrison a fraudulent deed purporting to bear date April 23, 1894, the existence of which was carefully concealed from the public until June 14th, 1894, when it was filed for record in said recorder's office.   That said prosecution before the recorder's court of the city of Cape Girardeau coming on to be heard on 26th day of April, 1894, the said deed to Mary Fisher was by Morrison's counsel offered in evidence to prove that said lot belonged to Mary Fisher, and Morrison himself testified under oath, on said trial, that Mary Fisher was the owner of said lot.   That Ida A. Morrison was cognizant of and participated in the defense to said prosecution, by and through her agent, James M. Morrison, in accordance with the contract 'contra bonos mores' hereinbefore set out.   That Gertie Fisher, a daughter of said Mary Fisher, was duly presented in said recorder's court, by the city of Cape Girardeau, for being an inmate of and also for keeping the bawdy house on said lot.   That upon the trial of said prosecution both before the said recorder's court and on appeal of defendant in the Cape Girardeau court of common pleas, the last trial being on the 31st day of May, 1894, the said deed was again exhibited and offered in evidence to establish the ownership of Mary Fisher in and to said lot.   That James M. Morrison was present at both said trials of Gertie Fisher, acting as a sort of prochien ami to and for said fair defendant, and this plaintiff, by and through her said

agent, was cognizant of all that occurred on said trials and fraudulently withheld her pretended deed from the land records until after the prosecution of Gertie Fisher was terminated. That on the 8th of June the defendant in good faith and for value bought said lot from Mary Fisher, practicing no fraud or deception upon her, and thereupon Mary Fisher executed and delivered a good and sufficient deed to defendant to said lot, which was by him filed for record in the proper office of said county on the 9th day of June, 1894, and duly recorded in deed book 27, at page 405, which filing for record was five days prior to the filing in said office of plaintiff's pretended deed. Wherefore, defendant prays judgment for his costs herein expended and for all other just and proper relief."

The *third* count, in substance, states that defendant bought the lot on date named in petition for valuable consideration and without notice of plaintiff's claim, and without notice of any circumstances sufficient to put him on inquiry.

Reply denied all new matter.

On a hearing upon the merits the circuit court dismissed the bill and plaintiff appeals.

The proofs were substantially these. The common source of title was conceded to have been in James M. Morrison. On March 10, 1894, James M. Morrison and his wife, the present plaintiff, by warranty deed conveyed the lot in suit to Mary Fisher. This deed was recorded April 24, 1894, at 12:30. On the twenty-third day of April, 1894, Mary Fisher by quitclaim deed conveyed said lot to Ida A. Morrison for the nominal sum of $500. This deed was not recorded until June 14, 1894. On June 8, 1894, Mary Fisher, by quitclaim deed, conveyed said lot to S. E. Juden, the defendant herein, which deed was recorded June 9, 1894, at 5:25 p. m. The only other evidence in

chief on part of plaintiff was a deposition of Mary Fisher taken by defendant and filed by plaintiff, and the oral testimony of Mr. Kimmel. Mary Fisher testified that she was a widow, was living in Cape Girardeau when the deposition was taken and had been there about two weeks. Previous to that her home was in Paragould, Arkansas, where she had resided five or six years. She had three daughters, Henrietta, Bertha and Ona. The eldest had been married, but was not living with her husband. Witness had no property whatever at time of testifying. Some two or three months previous to the taking of her deposition she had some property which she had bought of J. M. Morrison. She says she was to give him $600 for it, but as a matter of fact only paid him $100, and she was to have as long as she desired to pay the balance. She gave him no note or other written instrument for the balance of the $600. She testified that Morrison paid her $25 and she reconveyed the property to him. He was to pay her $100, but had not, and she held no promise of his in writing for the balance, nor was any time specified in which he was to pay it. While she lived in the house Morrison visited it, but she could not say whom he came to see. She testified that she received $25 while at Paragould, and thought she was getting it from Morrison. She received the $25 a week after she made the deed. She testified she didn't know Mrs. Morrison, the plaintiff, and made the deed to her simply upon the request of Morrison. She testified he visited her married daughter Henrietta in Paragould after she left Cape Girardeau. She says she executed a deed, and only one, while in Paragould, at the law office of Messrs. Crowley, Luna & Johnson; that only Knox and Crowley were present when she executed it. Mr. Knox took her acknowledg-

ment.   She says Mr. Crowley told her the deed had
been sent by Morrison and she said she would execute
it if that was so.   She had no conversation with Mr.
Johnson.   She says Crowley read the deed to her.
Nothing was said about paying her, but Crowley paid
her $25 about a week later at his office in Paragould.
She says she told Mr. Crowley, Morrison owed her and
she had written him for money.   She asked him if
Morrison had written to him, and he said no, but he
had heard from him.   Morrison had never asked her
for another deed and had not written about it in any of
his letters.   When asked why she had made a new
deed to Morrison when he never had mentioned such a
thing or requested it, she answered, "I don't know
how to answer that question."   She says Crowley told
her a week or so after she had made the deed to Juden
that it was to Juden, and she told him she thought it
was to Morrison.   She paid fifty cents for his acknowl-
edgment, and fifteen cents exchange out of the draft of
$25 which she received for the deed.

George G. Kimmel testified that he knew defend-
ant Juden; they had offices in same room.   "I remem-
ber the trial of Gertie Fisher in common pleas court.
I heard part of it.   It was generally talked about."
Came to his office from courthouse and Juden was in
the office.   He remarked that "Morrison would be in a
h—ll of a fix if some one would go down to Arkansas
and get a deed from that Fisher woman.   In a half
hour or such a matter Juden said, 'Well, judge, I have
written for that deed.'"   On cross-examination he
testified, "I was at the courthouse in Cape Girardeau
when Gertie Fisher was on trial for keeping a bawdy
house.   I saw Mr. Burrough, attorney for Gertie
Fisher, offer in evidence a certain deed from J. M.
Morrison and wife to Mary Fisher, conveying the lot
in controversy where the bawdy house was said to be

kept.  When I left the courthouse and went to my office Juden and a number of others were there.  I made the remark to the whole crowd, not to Juden.  I was talking in a disinterested way.  I had no interest then nor have I now in the lot in controversy.  J. M. Morrison was in the courthouse at the Gertie Fisher trial when this deed was offered.  I had no authority from anyone to speak to Juden or anyone about the title.  *I did not know that Mrs. Morrison had a deed from Mary Fisher.*"

The foregoing is plaintiff's case.  The defendant called J. M. Morrison, the husband of plaintiff, who testified, without objection, that he sold the lot in suit to Mary Fisher, March 10, 1894.  His wife joined in the deed.  "Since then she became dissatisfied and wanted me to buy back.  I had sold for $500 and she paid me $100.  I bought back April 10th or 11th, 1894.  I paid her $25 then and have since paid her $75.  I paid out my wife's money.  I acted for my wife in buying it.  I did not know Mary Fisher long, three to six days, when I sold to her.  Did not know her business.  Never rented the house to her.  I sold it.  I had no dishonest purpose.  It was an honest sale.  About the balance of the purchase money, I intended to take a deed of trust back but I had fooled along and neglected it, and finally my wife bought it.  I had no note from Mary Fisher.  Men have owed me as much as $1,000 and I had nothing to show.  I didn't file her deed from me to her.  When my wife bought, I told her to have her deed recorded in order to keep it straight on the books.  The deed to Mary Fisher was signed and acknowledged at my house.  When the deed was made I didn't know how much cash I was to get.  Expected to get all, but she said she couldn't spare it.  The city had two cases against me, one for renting out a house for bawdy house purposes, and the other for frequent-

ing a bawdy house.   I was acquitted of both charges. From March 10th to April 23d, Mary Fisher owed me $400 and I had no note, or deed of trust or due bill from her.   I paid $75 to her four or five weeks since.''

The marshal of the city testified that Mary Fisher lived in a bawdy house and was the mother of Gertie Fisher who was prosecuted for keeping such a house. Was present at the trial of James M. Morrison before the recorder of the city.   He testified that he had sold the lot to Mary Fisher, did not own it and that Mary Fisher owned it then.   The warrants for Morrison's arrest were issued April 23, 1894, and his trial was on May 4, 1894.

The deputy marshal testified he was one of a party of officers who raided the Fisher house on this lot. Found four men and six women.   Morrison was one of the men and Mary Fisher was there.   He arrested all but Mary Fisher.   Eaton testified that Morrison swore on his trial that Mary Fisher owned the lot at the time of the trial.

The records of the police court of Cape Girardeau showed that Gertie Fisher was charged with keeping a bawdy house in the house in suit from March 10 to April 21, 1894, and was tried on said charge in May, 1894, and convicted.   That James M. Morrison was charged with renting the house in question for a bawdy house from March 10 to April 21, 1894, and was acquitted.

The defendant Juden testified that he had no personal acquaintance with Mary Fisher and never saw her save on the one occasion of the taking of her deposition hereinbefore set out; that about the first or second day of June, 1894, he prepared a deed to the lot in suit from Mary Fisher to himself and sent it to a firm of attorneys in Paragould, Arkansas, whose names he obtained from a legal directory, asking them to see her

and offer her the amount ($25) named in the deed if she would execute the deed and send it to the bank in Cape Girardeau. He advised said attorneys that she was a woman of bad character and would probably be found in some questionable resort. On June 9, 1894, he received notice from said firm that the deed had been executed and sent to the bank. He paid the consideration to the bank, obtained the deed and put it to record. At that time he says he had no information that Mrs. Ida Morrison owned the lot or had any interest in it, but supposed that Mary Fisher owned it; that he had it from J. M. Morrison's own lips that Mary Fisher owned it. About the twenty-sixth of April, 1894, defendant was at the *New Era* office. Morrison and some women were being tried at the courthouse, Morrison for renting the house for a bawdy house. He and I were good friends and the cases were being talked about a good deal. As he passed me I hallooed, "Hello, Coxey." He stopped. I asked how he was coming out at the courthouse. Morrison said they had no hold on him, that he didn't own the lot, that Mary Fisher had a deed to it. Afterwards on May 31 defendant heard Mr. Burrough argue a motion for new trial in City v. Gertie Fisher, and he said the deed from Morrison to Mary Fisher ought not to be ruled out. It was good evidence. Morrison was present and he smiled. "When Judge Kimmel spoke about the matter, I already knew of the Mary Fisher deed." I don't remember that Kimmel used the words that he has testified to. Don't remember that he said anything. His remark was not the cause of my writing for the deed. I did not attach much importance to what Kimmel said. Had a conversation with Sam Davis after I got my deed. He said that was a slick scheme. I said we would try that question in court. He asked what I paid, if I only paid $15, and I said

that was my business and Mary Fisher's; if she was a fool it was all right. I entered into no conspiracy with the Arkansas lawyers to defraud anybody.      I did not know them when I wrote them. I got their names from a directory. I first learned that Mrs. Morrison had a deed to this lot on June 16 from my cousin Charles Juden.      When I got my deed I was not conscious of any facts that would lead me to think any one but Mary Fisher owned the lot.      From what Morrison said and from what Mr. Burrough argued in court I supposed Mary Fisher was the owner.      I had never seen the lot when I bought it, save at a distance. It is in a disreputable neighborhood and hard to rent to any one save to negroes or for a bawdy house. When I bought I thought it was worth $150 or $200. Since I have examined it, I think it is worth $400.

Mr. A. A. Knox testified he was a lawyer and notary public and resided at Paragould, Arkansas. Mary Fisher came to his office with Mr. R. E. L. Johnson of the law firm Crowley, Luna & Johnson, and executed and acknowledged a deed before him, witness, as notary.      She manifested no hesitancy whatever in making the deed; that was the only time she ever was at his office.      He heard no representation that the deed was to Morrison, and he made none to her to that effect. No one told her that the money was coming from Morrison.

W. S. Luna testified he was a member of the law firm of Crowley, Luna & Johnson at Paragould.      He remembered seeing Mary Fisher in June, 1894, at their office.      She had been requested to call at our office and examine a certain deed of conveyance to a lot in Cape Girardeau.      When she came in, the deed in blank was presented to her and she asked our Mr. Johnson to read it over to her, which he did.      We asked her if she understood the nature and effect of the instrument and

she said she did. We inquired if she knew Simeon E. Juden and she said she did. She said the deed was all right, and she was willing to sign if she got the $25. Mr. Johnson then assured her that when she signed it, it would be sent to the Sturdivant Bank and not delivered until Juden paid the $25, and the bank would forward us the money or to her, whichever she preferred. She said have it sent to us and she would come and get it. Mr. Johnson then told her the acknowledgment would have to be taken before a notary public, and he and she left to go to Mr. Knox's office. About a week later the money came and she came to receive it. Mr. Johnson told her that there were sixty-five cents charges, fifty cents for the notary and fifteen cents exchange, and she said she was willing to pay it, and they left for the bank to take it out of the draft. Mrs. Fisher never came to our office on any other business. No representation was made to her that the deed she was making conveyed the property to J. M. Morrison or Ida A. Morrison, nor that the $25 was to be paid by James M. or Ida A. Morrison. We had never heard of such persons at that time. She knew we were acting for Mr. Juden. The deed was read to her correctly, word for word, and she said she understood it. Our partner, Mr. Crowley, was not present when Mary Fisher was at our office during any of these transactions. He is and was at that time receiver of public moneys at the United States land office at Little Rock.

R. E. L. Johnson testified that his firm received the letter from defendant Juden conveying certain property in Cape Girardeau from Mary Fisher to Simeon E. Juden. He requested us to have her execute the deed. I asked our marshal to find her, which he did and she came to our office. I told her we had received in the morning mail a letter inclosing a deed from her to Simeon E. Juden of Cape Girardeau, Mis-

souri, to a lot in said city, and the consideration ex-
pressed in the deed was $25. I inquired if she was willing
to execute and acknowledge it.   She said she was if she
could be assured she would get the $25.   I told her the
deed would be sent to the Sturdivant Bank and not
delivered till Mr. Juden paid the $35, the amount of the
consideration in the deed and $10 for our services.   She
said she would execute it, and after having read the
same to her carefully and slowly and correctly and ex-
plained to her fully and completely the effect of her
signing the deed, she went with me to the office of Mr.
Knox to execute it.   When they reached Knox's office
it was explained to Knox and he took her acknowledg-
ment and she stated she understood the purposes of the
deed.   She only had twenty-five cents and I told Knox
I would collect it when the money came.   Neither he
nor any member of his firm told her the deed was to
J. M. Morrison or Mrs. Ida A. Morrison, nor that
either of the Morrisons was paying the $25.   Neither of
us knew J. M. or Ida A. Morrison nor had ever heard
of their existence.   There was no understanding between
us or either of us and Juden to cheat or defraud Mrs.
Fisher, Mrs. Morrison or J. M. Morrison.   Mr. Crowley
was not present at any time when Mrs. Fisher was at
our office in these transactions.

I.   So much of the petition as charges that Juden
obtained the deed from Mary Fisher by falsely repre-
senting that he was obtaining it for J. M. Morrison was
not sustained by the credible evidence in the case.  The
circuit court found against that view of the case and we
think the evidence amply justified it in so doing.  Mary
Fisher says her conversation in the office of Crowley,
Luna & Johnson was with Mr. Crowley.   Luna, John-
son and Knox, whose testimony was straightforward
and consistent, all agree that Mr. Crowley was not in
Paragould at that time, and hence could have made no

representation whatever to her.  They testify with per-
fect frankness and obviously with no motive for con-
cealment, that they received Juden's letter offering
Mary Fisher $25 for the lot, sent the marshal to her,
and she came and was asked if she knew Juden and
she said she did, and would make the deed for that
sum if she could be assured she would get it.  They
advised her they would send the deed to the bank
and it would not be delivered until the money was
paid.  Thereupon she executed it and no mention of
J. M. Morrison or Mrs. Morrison was made by or to them
or either of them, by Mary Fisher.  There is not the
slightest evidence that either of these three gentlemen
knew Mary Fisher had previously deeded the lot to Mrs.
Morrison.  When the moral character of Mary and the
glaring contradictions of her testimony are weighed
against that of Johnson, Luna and Knox no court could
hesitate in saying her evidence was wholly unworthy of
credence.  It is also clear that Juden made no repre-
sentations whatever to Mary Fisher other than the offer
to give her $25 for the deed.  He never saw her or spoke
to her until her deposition was taken after this suit was
commenced.

If plaintiff recovers she must do so on the ground
that defendant had actual notice or sufficient circum-
stances to amount to actual notice of her prior unre-
corded deed from Mary Fisher.  The circuit court found
against her on this theory.  Is there enough evidence
in the record to require this court to ignore the finding
of the circuit court?  It will be observed that Mrs. Mor-
rison does not testify in this case.  The quitclaim deed
from Mary Fisher to her was executed April 23, 1894,
but was not recorded until June 14, 1894.  Until re-
corded her deed had no validity save as between herself
and Mary Fisher and such as had actual notice thereof.
R. S. 1889, sec. 2420.  Prior to the recording of her

deed defendant had purchased the lot from Mary Fisher, paid the purchase money, and received and recorded his deed on June 9, 1894. "Actual notice" within the meaning of our statute is used in contradistinction to the constructive notice imparted by the record of a conveyance. It does not mean direct evidence that the subsequent purchaser actually knew of the existence of the deed. Any proper evidence tending to show it, facts and circumstances coming to his knowledge that would put a man of ordinary circumspection upon inquiry will suffice. *Maupin v. Emmons*, 47 Mo. 304. As said by this court in *Connecticut Mutual Life Insurance Company v. Smith*, 117 Mo. 292: "Courts of equity, since their earliest foundation, have always recognized that the still, small voice of suggestion, emanating as it will from contiguous facts and surrounding circumstances, pregnant with inference and provocative of inquiry, is as potent to impart notice as a presidential proclamation or an army with banners." Applying these principles, did Juden have actual notice of the deed from Mary Fisher to Mrs. Morrison? The pith of the argument of counsel for plaintiff to demonstrate that Juden had notice is found in their discussion of Judge Kimmel's statement. They insist that this statement inspired his speculative desires and contained the elements of notice. They urge that it put him on inquiry. Concede this, and then let us see where it would lead. In this suggestion there is not the remotest hint that Mrs. Morrison would suffer if Mary Fisher should deed the property. At the utmost it would only have required Juden to inquire of J. M. Morrison and examine the records of deeds in the absence of any intimation whatever that Mrs. Morrison had a deed. Consulting the records he would have found that on March 10, 1894, J. M. Morrison and wife had conveyed the lot to Mary Fisher and the deed had been recorded March 24, 1894.

Was it his duty to again consult Morrison? We think not, inasmuch as Morrison had already told him about the first of May, 1894, that Mary Fisher had a deed to the lot, and *he, Morrison, did not own it*. The law did not require him to go again to Morrison and inquire if he had told him an untruth. Morrison's statement already made, coincided with the fact disclosed by the record, and was buttressed with the actual possession of the Fishers. Had he inquired of Judge Kimmel for his reasons for saying it would place Morrison in an awkward dilemma if Mary Fisher should deed it to some one, it is clear he would have learned nothing of Mrs. Morrison's deed, because Kimmel swears he knew nothing at that time of a deed from Mary Fisher to Mrs. Morrison. So that had Juden followed "the voice of suggestion" it would have led to one result, namely, that Mary Fisher had a deed. It is scarcely in the probabilities that Morrison, who had evidently contrived this scheme to avoid conviction under section 3816, Revised Statutes 1889, for knowingly leasing any house used as a bawdy house or brothel, would have told Juden of the deed to his wife, when he had sworn up to that date that the property belonged to Mary Fisher. When one is put upon inquiry and follows it as Juden did and finds nothing and there is nothing to find, he has exhausted the diligence required by the law and courts of equity.

We hold there was nothing in the statement of Judge Kimmel that conveyed any suggestion or intimation of a title in plaintiff and that defendant had no actual notice of her deed within the meaning of our statute and the decisions of this court.

But there is another ground upon which plaintiff must fail. The only suggestion of notice is that found in Judge Kimmel's statement and he was a stranger to the title, in no manner interested in it, and was not author-

ized to speak for Mrs. Morrison, and his statement was a mere vague conjecture of his own and not made in the transaction out of which defendant's deed originated. Such vague and flying rumors by strangers do not constitute actual notice.    Wade on Notice, sec. 29; 2 Pom. Eq., secs. 597–602.

Finally, there is no equity in the plaintiff's case. Her title depends upon the thoroughly discredited statements of J. M. Morrison and Mary Fisher, and originated in the unlawful intrigue of her husband with the Fisher woman whereby he leased her his house for a brothel.    While these deeds served to protect him from the penalties of the criminal law, they can not be permitted to aid him in entrapping others who dealt with the "scarlet woman" on the strength of his word and the record of his deed to her.    Conceding plaintiff was ignorant of the corrupt scheme by which the property was placed in her name, according to her own averments by her own negligence she omitted to file her deed for record until defendant without notice thereof purchased the lot and placed his deed on record, and she must abide the consequences.    Perhaps it may prove a salutary lesson to her husband and others of like disposition in the future to abstain from transactions which the law denounces and which courts of equity will not countenance nor lend their aid to secure the unholy profits thereof.

We discover no reason for reversing the finding and decree of the circuit court and accordingly it is affirmed.    SHERWOOD and BURGESS, JJ., concur.

### SEPARATE OPINION.

SHERWOOD, J.—*Delenda est Carthago*.    Error, unrepentant, must be destroyed.

Gentle reader, if you have ever chanced to wander through that wilderness of undigested volumes, which

Judge LEONARD on one occasion said were not *law-books*, but only *Missouri Reports*, you mayhap have encountered the case of *Hickman v. Green*, 123 Mo. 165. If not, it shall be my pleasing task now to unfold to you the prominent points and salient characteristics of that *cause celebre*.

In that case, one Mrs. Green owned a farm of forty acres in the county of Audrain, some three miles from the city of Mexico. There lived in that city a Mrs. Hickman, who was in the open and exclusive possession of lot 35 in Spark's addition, and had been thus living there for three years, having bought the same for the sum of $2,000 in cash, from one Lakenan, but the deed from him to her had not been put to record. So that Lakenan, upon the record, appeared to be the owner, but his unrecorded deed to Mrs. Hickman conveyed to her only a life estate with remainder to her bodily heirs, to wit, her children, several of whom were minors and so remained at the time they endeavored to be restored to their *confiscated* rights.

In this posture of affairs, with Lakenan as the record owner, and Mrs. Hickman in possession, and for the space or time aforesaid, which fact of notorious and exclusive possession was well known to Mrs. Green, the latter formed the desire of exchanging her forty acre farm for lot 35 on which Mrs. Hickman resided. Being thus desirous, she being a married woman, engaged the services of two land agents to effect the exchange for her, of her farm for that lot, and in the written contract or memorandum which she made to them and with them for such exchange, she expressly mentions lot 35 as *"belonging to Frances D. Hickman."* This contract or memorandum was duly signed by Mrs. Green. Two days later, a similar contract or memorandum for the exchange of lot 35 for the farm, was made to and with the *same* agents by Mrs. Hickman.

Mrs. Green, though she had been in to see Mrs. Hickman and the house two or three weeks before the exchange was effected, made no inquiry of her grantor what the legal title was, outstanding in Lakenan, nor did she make a like inquiry of him respecting such title. In addition to that, Mrs. Green not leaving the matter to the real estate agents to investigate, as is their custom, the titles and prepare abstracts, went and employed one Duncan, *not, however, to examine the title and pass upon it*, but only to tell her whether *Lakenan's deed in that form* (*i. e.*, a quitclaim) *would pass the title*. Duncan replied that it would, and thereupon Lakenan executed a quitclaim deed to Mrs. Hickman alone, the latter executed a general warranty deed to Mrs. Green, receiving from Mrs. Green a general warranty deed, following in its form and effect as a conveyance, the original deed from Lakenan to Mrs. Hickman for life, with remainder to her bodily heirs. This being done, the original deed from Lakenan to Mrs. Hickman, of which one of the real estate agents had knowledge prior to the exchange of deeds between Mrs. Hickman and Mrs. Green, was destroyed by such agent.

On this state of facts, the lower court held that Mrs. Green was an *innocent purchaser without notice*, and the petition of plaintiffs was dismissed. *This court affirmed that decree* and thus the infant heirs of Mrs. Hickman were, under the forms of law, robbed of their patrimony. Among other observations about the force and effect of our registry acts, four of the judges of this court in that case said: "Much stress is laid upon the fact that when Mrs. Hickman and Mrs. Green began to trade, the title of record was in Lakenan with Mrs. Hickman in possession. This is true, but there is absolutely no evidence that Mrs. Green

knew anything whatever about this title of record."
123 Mo. *loc. cit.* 177, 190.

This remark would seem clearly to indicate that
our deed records impart *no constructive notice* unless
there be *suppletory evidence* to show that the party to
be affected thereby *"knew . . . . . . . about this title of
record!"* I have thus in as succinct manner as I could,
given a general outline of the *Hickman-Green* case.

Under the rulings in that case, even if Juden had
stated above his own sign manual the title to the house
and lot to be in plaintiff, Mrs. Morrison, and even if
like Mrs. Hickman, Mrs. Morrison had been in pos-
session of that house and lot for three years under an
unrecorded deed from Mary Fisher, and even if Juden
had failed to make any inquiry of Mrs. Morrison as to
what the legal title was, outstanding in Mary Fisher,
and had failed to make like inquiry of Mary Fisher,
still, any of these things or all of them combined,
would have afforded *no notice to Juden!* This being
the case, if the *Hickman-Green* case is to stand for law,
it seems to me like a waste of time to talk about Juden
having received notice in the circumstances set forth in
this record. If, with all the circumstances mentioned
in the *Hickman-Green* case, "pregnant with inference
and provocative of inquiry," Mrs. Green was not noti-
fied, then *a fortiori*, Juden is and must be an innocent
purchaser *par excellence.*

But regardless of whether *Hickman v. Green* was
correctly decided, I do not feel prepared to hold that
the lower court ruled incorrectly in dismissing the pe-
tition of plaintiff, and in this connection it seems per-
tinent to say that the idea is well supported by the
evidence that Morrison conveyed the property in ques-
tion to Mary Fisher, by absolute deed, in order to
evade or baffle prosecution under the statute which for-
bids leasing for immoral purposes. If he did this,

then if he were an actor in this proceeding, it is clear he would have no standing in a court of equity as against Juden. *Sprague v. Rooney*, 104 Mo. 349.

Nor has Mrs. Morrison any better standing in such court, inasmuch as it does not appear that she had any property of her own wherewithal to buy the house and lot. Presumptively the personal property of the wife is that of the husband. *Weil v. Simmons*, 66 Mo. *loc. cit.* 620 and cases cited.

No evidence was offered on plaintiff's part to overthrow this presumption. If she had no funds of her own, then she must be regarded as a mere volunteer, a mere conduit of the title, and therefore in the same predicament as her husband, so far as equitable interference is concerned. Under this view, it is wholly immaterial whether Juden had notice or not.