AMERICAN BANK, Appellant, v. W. G. BRAY, ORA BRAY and J. H. O'BRIEN.—11 S. W. (2d) 1016.

Division Two, December 18, 1928.

*John T. McKay* for appellant.

*Hal H. McHaney* for respondent.

HIGBEE, C.—This action was brought in the Circuit Court of Dunklin County to reform a deed of trust executed by W. G. Bray and Ora Bray, his wife, December 15, 1911, to secure the payment of their note to the German-American Bank of DeSoto for the sum of $3500 and interest, due two years after date. The court found the issues for the defendant O'Brien and the plaintiff appealed. Since the appeal the death of J. H. O'Brien, one of the defendants, has been suggested, the appearance of J. L. O'Brien, the administrator of his estate, has been entered, and the cause revived in the name of the administrator.

It is averred in the amended petition that plaintiff bank is a corporation and successor to the German-American Bank; that W. G. Bray owned the southeast fourth of the southwest quarter of Section 32, Township 17 north, Range 8 east, in Dunklin County, Mis-

souri, and that it was mutually intended that Bray and his wife would convey said tract by a deed of trust to secure the payment of their note for $3500 to the German-American Bank, a corporation, but by mutual mistake in making said deed the said tract was erroneously described as being in Range 9 east, a tract of land which W. G. Bray did not own; that at a later date Bray and his wife conveyed the tract first described to John Keating and wife and Bray took back a deed of trust on said tract from Keating and wife to secure the payment of the notes given to Bray for the purchase price, and afterwards Bray assigned said notes given to him by Keating to H. O. Stonum, as collateral security to a note given by Bray to Stonum, which deed of trust was duly filed and recorded in the office of the Recorder of Deeds of Dunklin County, Missouri; that Stonum, as holder of the notes, on January 16, 1922, foreclosed said Keating deed of trust for default in payment of the notes, and J. H. O'Brien became the purchaser at said sale of said tract of land first above described, and that said J. H. O'Brien had full knowledge at the time he purchased at said sale that there was a former deed of trust against the said real estate.

The amended answer of J. H. O'Brien is a general denial, and denies any knowledge or notice of any claim of plaintiff through any deed of trust on said land; that he bought said land in good faith and expended ——— dollars for same; that he has made lasting and valuable improvements thereon without notice of any defect of title, and that Bray and his wife are the plaintiffs in fact in the case and do not come into court with clean hands.

The evidence shows that Bray and his wife executed the deed of trust as averred in the petition to secure the payment of their note to the German-American Bank; that they intended to convey the forty acres of land in Range 8, as averred, which was owned by Bray, but by mutual mistake the tract was erroneously described as being in Range 9, a tract not owned by Bray. The note secured by the deed of trust remained unpaid at the time of the trial.

Bray testified that Donnell was present when the deed of trust was executed and he thought the deed was made to him, as he understood Donnell owned the bank. Bray did not learn of the error in the description of the land in the deed of trust until after the foreclosure of the Keating deed of trust. Mr. Donnell died before the trial.

On May 16, 1916, W. G. Bray and his wife executed a deed of trust, which was duly recorded, conveying 240 acres, including the forty acres in controversy, to secure his notes for $5,165, payable to the Abston-Wynne Cotton Company or order, "subject to a former deed of trust for about $25 per acre, together with other property,

due in three years.'' On April 15, 1917, W. G. Bray and wife conveyed this forty-acre tract in 32-17-8 and the northwest fourth of the northwest quarter of 5-16-8 east to J. A. Keating by warranty deed, ''except deeds of trust given to Abston-Wynne Cotton Company, together on other lands and to A. B. Donnell and W. M. Hunter by W. F. Dye.'' At the same time, Keating and his wife executed a deed of trust conveying said tract, the southeast fourth of the southwest quarter of Section 32, Township 17, Range 8 east, and the other forty-acre tract, to C. O. Bray in trust to secure the payment to W. G. Bray of nine negotiable promissory notes of even date, aggregating $7,536, the first payable November 15, 1917, and the others at yearly intervals thereafter, the last maturing November 15, 1925. This deed provided that ''if any one of said notes should not be paid when due, they should all become due and payable, and the trustee, or the sheriff in his absence or refusal to act, might proceed to sell the land, as is usually provided in deeds of trust. Two or three years later, Bray assigned these notes to H. O. Stonum as collateral security for his note to Stonum for $4000. It was under the foreclosure of this Keating deed of trust that J. H. O'Brien, on January 16, 1922, became the purchaser of the forty-acre tract, the southeast quarter of the southwest quarter of Section 32, Township 17, Range 8 east (and the forty acres in 5-16-8), as averred in the amended petition, for the consideration of $2500.

On June 28, 1913, W. G. Bray and his wife executed a deed of trust conveying forty acres in 5-16-8 east, in Dunklin County, to Anna B. Donnell, in trust to secure the payment of Bray's note for $1000 to W. S. Johnson. Prior to April 15, 1917, W. F. Dye executed a deed of trust to W. M. Hunter on the same forty acre tract in 5-16-8. These were recorded and offered in evidence to explain the exception in the warranty in Bray's deed to Keating.

Bray further testified: On the day of the sale I saw O'Brien and Stovall. Stovall (O'Brien's son-in-law) asked about the title to that land and I told him there were other deeds of trust against that land and if they bought that land they would buy trouble, and in a few minutes Mr. O'Brien came to me and asked me about it and I told him about it. To the best of my knowledge that was during the time the sheriff was crying the land off. I told Stovall and O'Brien there was a prior deed of trust against this land. I expect I had told Stovall a dozen times prior to that time about it. Stonum knew there was a second deed of trust against it. I told him; we discussed it time and again. I told Mr. O'Brien while the sheriff was calling the crowd together to cry the sale.

Cross-examination: I mentioned in the deed to Keating a deed of trust to Abston-Wynne and Donnell and I don't recall if there is

any more or not. Q. And Hunter? A. Hunter by Dye, I think, and one to Donnell. Q. Had you ever given Donnell a deed of trust on this land or had you ever intended to give him a deed of trust? A. Yes, sir. I thought the deed of trust was given to Donnell. I didn't see the deed of trust until I got a copy of it made. I signed it. Mr. Donnell seemed to represent the bank fully and lots of times the paper was made to old man Donnell and he would assign them to the German-American Bank, but it seems to me Donnell was present when this deed of trust was drawn up and Walter Johnson drew the deed of trust and I signed it and carried it to the house and got my wife to sign it and Johnson called her by telephone and acknowledged it. I can't say that I read the deed of trust over. I indorsed these notes to Mr. Stonum on the back and he has still got them. Donnell is dead. He always collected the interest once a year.

This was all the evidence offered by the plaintiff.

The respondent, O'Brien, read in evidence the trustee's deed under foreclosure of the Keating deed of trust, conveying the forty-acre tract in question and the forty acres in Section 5, dated January 16, 1922, for the consideration of $2500, to J. H. O'Brien. He also read in evidence the deed of trust given by W. G. Bray to Abston-Wynne, dated May 16, 1916, recorded, for the purpose of showing "that is the only thing that appeared as against this land."

J. H. O'Brien testified: I remember buying this land. I did not see Mr. Bray until after the sale was over. After I bought the property I gave the sheriff a check for the land and coming out I met Tom Stovall and Mr. Bray and he asked Stovall who bought the land and he mentioned that I bought it and he said: "That won't hold because there is a mortgage on it." I immediately had Mr. Huffman to look it up and he said: "Yes, Abston-Wynne holds a mortgage against it," and I went to McKay (appellant's attorney) and had him to pass on it, and he said: "You must get this cleared or it won't stand," and says: "You go back ten years." And I went to you (Mr. Pankey, Mr. O'Brien's attorney) and you told me you were attorney for Abston-Wynne and you phoned down there (Memphis, Tenn.) and they told you they would clear that title for $200, and Mr. Stonum said to hold $200 until the title was cleared. I went to Mr. McKay and he told me when I got that cleared to go back ten years on the record and if there is nothing else there you are safe. Mr. Huffman went back twelve years on the record and found nothing else against it. Mr. Huffman is abstracter with the R. H. Jones Abstract Company. Mr. Bray did not at any time prior to the institution of this suit mention to me any deed of trust given to Mr. Donnell. He said there was a deed of

trust against it and all we could find was the Abston-Wynne deed of trust. I built a barn on the place; cost, about $600. It burned mysteriously and I built another barn at a cost of about $750, and made other improvements costing about $1700. I paid $2500 and back taxes for 1922 and 1923, about $100 each year. I never saw Bray on the day of the sale until after the sale was over. I never heard of any secret contracts between Stonum and Bray or of any private deeds of trust given by Bray to Mr. Donnell or the American Bank.

Cross-examination by Mr. McKay: When Bray talked to me he never mentioned what deed of trust was against it. At that time I had given my check to the sheriff. I don't suppose it had been cashed. This is the same land I talked to you (Mr. McKay) about. All you told me was to have the abstracter to make an examination; to look back ten years, and Mr. Huffman looked back twelve years. Mr. Bray didn't give me time to ask him who held the deed of trust; he seemed to be mad; whirled on his heel and come on upstairs. I got $700 rent for the land one year and $400 last year—$1100. I presume I could have stopped payment on my check; don't know whether I could or not.

Re-examination: You (Mr. Pankey) said you could have the title cleared for $200. The money was left with some one and the record was cleared. I have never had any other conversation with Mr. Bray on this subject from that day to this.

T. J. Stovall testified: I am Mr. O'Brien's son-in-law. I had a conversation with Mr. Bray on the day of the trustee's sale of this forty acres. It was immediately after the sale. I didn't see him until after the sale. Immediately after the sale Mr. O'Brien wrote Mr. Timberman (sheriff) a check for the amount of the sale. Mr. Bray walked up and asked who bought the land. I said Mr. O'Brien bought it. He said the sale would not stand; there is another deed of trust against that land. I said I am glad you told me, and he walked up the steps and I didn't get a chance to discuss it with him. The next thing we did was to get Mr. Huffman to run back the records to see what deed of trust there was against this land and got the dates and deed of trust. We went to McKay's office and he told us to clear up the Abston-Wynne deed of trust and if we would do that he thought it would be all right. We paid his fee, $2.50. We went to you, Mr. Pankey. You said you were attorney for Abston-Wynne and phoned down there and they said it was less than $200 and we left the $200 with you to satisfy the Abston-Wynne Cotton Company and paid Mr. Stonum the other $2300. I didn't know at that time about a deed of trust to Donnell or the American Bank on this land.

Here the satisfaction on the record of the Abston-Wynne deed of trust was read in evidence. It was testified that Bray made an affidavit of the loss of the notes secured by the Abston-Wynne deed of trust and assisted in getting the record thereof released and satisfied. The bill of exceptions recites: "It is admitted the deed of trust referred to in the deed given to Keating is subject to a deed of trust given to Hunter by Dye and was not on the land in controversy, but on the other forty acres described in the deed given to Keating."

H. O. Stonum testified: I got the Keating notes secured by a deed of trust on lands in section 32-17-8. I never knew that land was subject to any deed of trust given by Mr. Bray to any bank; knew nothing about that at all. Mr. Bray told me a short time after he gave me this he owed a little on another deed of trust; that it was a cotton company and he would straighten that up.

Cross-examination: Bray didn't tell me there was another deed of trust on this and other property that he owed the American Bank or Donnell.

Mr. H. B. Pankey, attorney for O'Brien, testified: I was attorney for Mr. Stonum before and at the time of the foreclosure of the Keating paper. Mr. Bray was given notice of the day of sale. After the sale I took the matter up with Mr. Bray, as attorney for Abston-Wynne and for H. O. Stonum, about the difference due Abston-Wynne. He told me he had given them a deed of trust and that the amount they had stated as a balance was correct. At no time did Mr. Bray mention that there was a deed of trust given to Donnell or to the American Bank. There are nine of the Keating notes. They are now offered back to Mr. Bray. Mr. Keating is entitled to to credit of $2500.

Mr. Bray testified in rebuttal: Mr. Pankey was in error about me not telling him there was another deed of trust on the land; that there would be a lawsuit, and it would have to come out. I thought the deed of trust was given to Donnell, because he always collected the interest.

It may clarify the case briefly to recapitulate the evidence. It is clear that Bray intended to convey the forty acres in Range 8 which he owned and not the forty acres in Range 9, described in the deed of trust, which he did not own, and that the mistake was made by both parties to the deed. Bray took the deed home and had his wife execute it, but did not discover the error in the description, nor that it was executed to the German-American Bank. On May 16, 1916, Bray and his wife executed a deed of trust on two hundred and forty acres of land in Dunklin County, including the forty in question, to Abston-Wynne Cotton Company of Memphis, Tennessee, to secure the payment of notes of even date for $5165, "subject to a former

deed of trust for about $25 per acre," which deed was duly recorded. On April 15, 1917, Bray conveyed this forty acres in Section 32-17-8 and a forty-acre tract in 5-16-8 to J. A. Keating for the consideration of $8000, by warranty deed, "except deeds of trust given to Abston-Wynne Co., together on other lands, and to A. B. Donnell and W. M. Hunter by W. F. Dye." The A. B. Donnell and Hunter deeds of trust were on the land in Section 5. Bray's deed to Keating did not mention or except a deed of trust to the German-American Bank on the forty acres in question. Bray took from Keating notes for the purchase price of the land conveyed, secured by a deed of trust, which notes, shortly thereafter, he assigned to H. O. Stonum as collateral security for $4000. It seems to be clear on the evidence that Stonum was an innocent purchaser, having no notice of the alleged error in the description of the land in Bray's deed of trust to the German-American Bank. Just when Bray learned of this error does not appear, but it was after he assigned these notes to Stonum and after the trustee's sale to O'Brien.

On January 16, 1922, at the trustee's sale under the Keating deed of trust, at the instance of Stonum, the eighty acres conveyed by the deed of trust were sold, and J. H. O'Brien became the purchaser for $2500. Bray had been given notice of this sale. He testified that he told O'Brien and Stovall that there was a former deed of trust on this land and the sale would not stand. He did not tell them who held the deed of trust, but seemed to be angry and walked away. At that time he did not know and he did not tell them there was a misdescription in the deed of trust to the German-American Bank. Bray was solvent and really the one most interested. He should have known and should have told O'Brien that the German-American Bank or, as he understood, Donnell, held a deed of trust on the land. For more than ten years this deed of trust had remained on record and neither Bray nor the bank had discovered the misdescription. They were both guilty of negligence in that respect. Bray's statement, however, put O'Brien and Stovall on inquiry. They understood Bray to mean that they would find a deed of trust on this tract in the Recorder's office; they did what reasonable men in the circumstances would have done, they had the deed records searched and they found the deed of trust to the Abston-Wynne Cotton Company as the only incumbrance on the forty acres in Section 32. They were advised by competent counsel that when that deed of trust was satisfied the title would be clear. Bray assisted in getting the record of this deed of trust released and, so far as the record shows, said nothing about any other deed of trust on the land. I think the evidence fails to show that O'Brien had any notice of plaintiff's deed of trust or of an erroneous description therein or of plaintiff's equity to have its deed of trust reformed, but on the con-

trary, that the plaintiff bank, as well as Bray, was grossly negligent in not having discovered the erroneous description in the deed of trust and that O'Brien was a bona-fide purchaser for value of the land in question. [Morrison v. Juden, 145 Mo. 282, 298-9, 46 S. W. 994.]

Equity will not correct a mistake of this character as against a bona-fide purchaser for value. [Young v. Coleman, 43 Mo. 179, 185.]

Furthermore, on the evidence it seems clear that Stonum was an innocent purchaser of the Keating notes before maturity, in good faith and for value; the deed of trust passed as an incident to the notes. Under such circumstances O'Brien was not affected by subsequent notice of the equities or defenses of other parties; he took good title at the trustee's sale whether he had notice of plaintiff's equity to have its deed of trust reformed or not. [First National Bank v. Bohrer, 138 Mo. 369 (4), 383; Borgess Investment Co. v. Vetts, 142 Mo. 560 (4), 573, 44 S. W. 754; Baade v. Cramer (Mo. Sup.), 213 S. W. 121, 125 (9).]

The judgment is affirmed. *Davis* and *Henwood, CC.,* concur.

PER CURIAM:—The foregoing opinion by HIGBEE, C., is adopted as the opinion of the court. All of the judges concur.