## LEAVITT v. LAFORCE *et al., Appellants.*

**Fraud:** EVIDENCE OF, BETWEEN INTIMATES. Transactions between persons occupying intimate and confidential relations are subject to a more jealous scrutiny than those occurring between mere strangers, and the parties are held to fuller and stricter proof of the consideration and fairness of such transactions, when they conflict with the rights of others.

23—71

*Appeal from Schuyler Circuit Court.*—HON. ANDREW ELLISON, Judge.

AFFIRMED.

*Hughes & Raley* for appellant.

SHERWOOD, C. J.—The only question in this case is whether the defendants, Fellows and Winans, are *bona fide* purchasers or incumbrancers without notice.    As to Fellows, according to his own testimony, it distinctly appears that there existed between LaForce and himself relations of a friendly and confidential character; that he had the utmost confidence in LaForce; was frequently in his office; made that his headquarters; kept his papers in LaForce's vault, and, when the mortgage was executed, left it there.

In a recent work on fraudulent conveyances the doctrine is announced that transactions between relatives or those occupying intimate and confidential relations, are subjected to a more jealous scrutiny than when occurring between mere strangers, and that in such instances the parties are held to fuller and stricter proof of the consideration and of the fairness of the transaction.    The reason given for this rule, in substance is, that fraud is generally accompanied by a secret trust, and hence the selection of one in whom a secret confidence may be reposed, and as sentiments of affection commonly generate such confidence, relatives are usually selected as the repositories of the secret trust; but the same principle applies to all occupying confidential relations toward the party charged with the fraud.    Any association, therefore, which generates confidence and its consequent intimacies, " though not a badge of fraud, strengthens the presumption that may arise from other circumstances and serves to elucidate, explain or give color to the transaction."    Bump, Fraud. Convey., 54 *et seq.*    A doctrine even broader than this has been announced, for it has been held that where the grantor was

father of the grantee, this relationship was a ground, taken in connection with other circumstances, from which the jury might infer that the son had notice of the trust to which the land was subject in the hands of the father, Coulter, J., remarking: "In regard to such transactions it is impossible to shut our eyes to the relation of the parties. John J. could have inquired any day from his father how he held the land, and the most natural thing in the world is to believe that he did." *Trefts v. King*, 18 Pa. St. 157; Wade on Notice, § 25.

It is thus established at the very threshhold of this case, that if LaForce had in contemplation the perpetration of that with which the petition charges him, none would with greater likelihood have been selected as an assistant than his familiar, Fellows. Under such circumstances, if we are to be guided by the rule stated in the authority first cited, it would require somewhat more of exculpatory evidence in this, than in other cases where no such confidential relations existed. And if we follow the evident reason of the authority cited from Pennsylvania, the relations of confidence existing between LaForce and Fellows may well justify the belief—may well be regarded as evidence, when considered in connection with other circumstances, that the latter was cognizant of the trust to which the land was subject in the hands of the former. And the importance of the intimacy so existing between LaForce and Fellows becomes especially apparent when it is considered what opportunities were thus afforded the latter for becoming thoroughly conversant with the subject matter of the present litigation.

He knew when taking the mortgage on lands in Schuyler county, that LaForce had exchanged lands also in that county with Leavitt for a stock of goods in Minneapolis, and loaned LaForce some money to go to that point to take an invoice of the goods. Now if the intimacy spoken of really existed, it is extremely improbable, and probability is the chief corner stone of all reliable testimony, that La-

Force should have told his friend Fellows of the exchange he had made with Leavitt of lands in Schuyler county, for a stock of goods in Minneapolis, requested and received pecuniary assistance for his journey thither and still never told him, even in general terms, what lands he had exchanged. And besides, what inquiry could be more natural, when LaForce subsequently came for the loan of the $2,000, and tendered a mortgage as security on lands in Schuyler county, than that Fellows should ask him the location of the lands on which the incumbrance was offered. If these and similar inquiries were not made by Fellows, it indicates, on his part, an obvious disregard of the plainest dictates of prudence.

In the case of *Ware v. Lord Egmont*, 4 De Gex, M. & G. 460, Lord Cranworth observed: "When a person has actual notice of any matter of fact, there can be no danger of doing injustice if he is held bound by all the consequences of that which he knows to exist. But, where he has not actual notice, he ought not to be treated as if he had notice, unless the circumstances are such as enable the court to say not only that he might have acquired, but, also, that he ought to have acquired, the notice with which it is sought to affect him; that he would have acquired it but for his gross negligence of the conduct of the business in question." In short, gross negligence, under certain circumstances, is held, in equity, equivalent to notice.

We are inclined, therefore, to think that the facts we have detailed as to friendly and intimate relations give ground for the conviction that Fellows, owing to such relations, must have become conversant with facts which precluded him from becoming an innocent purchaser, or else that such ample opportunities were afforded him for obtaining the requisite information that his failure to do so can only be regarded as so grossly culpable as to amount in the estimation of a court of equity to that degree of willful negligence which is imputable to the party thus negligent as tantamount to notice.

In regard to the claim of Winans, we attach no importance to the information imparted to him at the time he brought the deed of trust for record; for, at that time, whatever rights existed had already been acquired by the loan of the money. 1 Sto. Eq. Jur. 400.

Winans resided in Mt. Pleasant, Iowa, and it appears from his testimony, came down on the 24th or 25th of March, 1875, to Schuyler county, Mo., and saw one corner of the farm remotely, from the junction depot, about one and a quarter miles off; that he looked at the land with a view of taking a deed of trust to see if it was worth the money. It does not appear that Winans had any other business to call him down to the locality of the land, except to ascertain its value; and, if he did not have, it is altogether beyond the range of probability that he should, having come down for the purpose of looking at the land, have gone no nearer to it than the distance he indicates. Why come from another state to ascertain the value of land offered as security, and never go upon the land to ascertain its value, the nature of the soil and the improvements? The story is quite too improbable for belief. It is contrary to the " experience of common life."

If Winans had ventured to examine the land upon which he contemplated taking an incumbrance, which he did take on the 26th of March, immediately upon his return home, he would have had an opportunity to ascertain from Morton, who was in possession as Leavitt's tenant, the true state of the title, and under whom held. But Winans seems to have studiously avoided going to the farm, as well as Glenwood, where the change of ownership of the farm was well known; at any rate, he did not go there, nor does he in his testimony give any explanation of his very unusual conduct in this respect. It was his duty, when offering himself as a witness, to have left nothing unexplained which would induce unfavorable inferences in regard to his *bona fides*. This he did not do. And it is not to be forgotten that, at Ottumwa, Iowa, where LaForce

and Fellows resided, the title bond to Leavitt was executed March 5th, 1875, and acknowledged before Morse, LaForce's partner ; that, on the 19th of the same month, before the same officer, and at the same place, the mortgage was made to Fellows and acknowledged; that, on the 26th of the same month, and at the same place, and before the same officer, the deed of trust to Winans was executed and acknowledged. These dates and other circumstances we have mentioned do not amount to much when separately considered, but when you consider them all together—when brought together and considered in the aggregate—they leave but little room to doubt the correctness of the judgment, which we now affirm. All concur.