## JOHNSON, Appellant, v. FLUETSCH.

### Division Two, June 30, 1903.

1. **Ejectment: PATENT: ISSUED TO WRONG PERSON: TRUSTEE.** To charge the legal holder of a patent as trustee of another and to compel him to transfer that legal title to such other, such other must present such an equity as will show that he himself was entitled to a patent, and in consequence of some erroneous ruling of the officers of the land office of the law applicable to the facts found, it was refused to him. He must show that by the law properly administered the title should have been awarded to him.

2. ——: ——: ——: ——: **CASE STATED.** The holder of a military land warrant in 1849 assigned it to defendant's ancestor, and he went with it at once to the proper land office and entered the land in controversy, and the usual certificate of location was issued to him, and he went into possession and he and his grantees have been in possession ever since, but the warrant which was retained by the land office was lost, and the register neglected to report the location to the General Land Office, and no entry was made at the time on the tract book except: "Located with bounty land warrant, about April, 1849, but name of purchaser does not appear on our books," and in 1898 a patent was issued to plaintiff. *Held*, that unless defendant shows that his remote ancestor was entitled to a patent as the assignee of the military land warrant and its location thereof on the land in suit, he is not in a position to challenge the patent issued to plaintiff, as he would be a stranger to the title.

3. ——: **MILITARY BOUNTY WARRANT: ASSIGNMENT: CONCURRENT OPINION OF ATTORNEY-GENERAL AND COMMISSIONER.** Military bounty warrants issued to soldiers of the Mexican war under the act of

Johnson v. Fluetsch.

Congress of 1847, were assignable after issuance and delivery, and the assignee could locate the land for which the warrant called, even though that act does not expressly give the soldier the right to assign them. Such a warrant secured to the warrantee a most valuable property right, and the common law is that all such rights are assignable unless there is some express statutory restriction prohibiting the exercise of that right. That act expressly passed that right to the warrantee's heirs or legal representatives in case of his death, and it is the general law that a property right that by operation of a statute passes by descent, is assignable. This view is enforced by the concurrent rulings to the same effect of the General Land Office and of the Attorney-General of the United States.

4. ————: ————: ————: SUBSEQUENT ENABLING ACT. Nor is this view of that statute impaired by the fact that in 1853 Congress enacted that all military bounty warrants were assignable. Such acts have often been enacted to remove any doubt that the common law still obtained.

5. Statutory Construction: COMMON LAW. Every statutory enactment is to be construed by the light of the common law and with reference to its cognate principles, since that law constitutes the foundation, and primarily the body and soul, of American jurisprudence.

6. Patent: MILITARY WARRANT: ASSIGNEE: TRUSTEE. Where a military bounty warrant was issued to a Mexican soldier under the law of 1847, and it was by him assigned after issuance and delivery, and the assignee took it to the proper land office and the register took it up and issued to him a certificate of entry and location, the assignee was entitled to his patent for the land, and defendant as the remote grantee of such assignee is entitled to have a decree that the person to whom the patent was afterwards wrongfully issued holds the title in trust for him, unless it appears that the patentee is an innocent purchaser, for value, and without notice.

7. ————: RIGHT OF STATE COURTS TO SETTLE EQUITIES. When title has once passed from the United States, the State courts have jurisdiction to determine the controversies between the adverse claimants to the land, and to decree that the title belongs, not to the person to whom the Government had wrongfully issued the patent, but to the person to whom the Government's equitable title had previously passed.

8. ————: INNOCENT PURCHASER: NOTICE. The warrantee of a military bounty warrant, after issue and delivery, assigned it to defendant's ancestor, and he took it to the proper land office, and there its officers retained it, issued to him a certificate of location, but neglected to make proper entries thereof on their books. The assignee entered into possession, improved the land, and devised it

Johnson v. Fluetsch.

to his son, who sold it to defendant's grantor. For fifty years it was occupied and used by them as a home, and then plaintiff applied for and obtained a patent, and brings suit in ejectment. At that time in the recorder's office of the county in which the lands lie was the tract book, made by the register of the land office by which the certificate of location was issued. In that book was this memorandum in reference to the land: "Located with bounty land warrant about April, 1849, but the name of the purchaser does not appear on our books." In the land office through which plaintiff got his patent, was this memorandum written in ink: "Vacant. See Comm's letter May 22, 1867," and this memorandum was made in pursuance to a letter from the commissioner of the General Land Office of that date. *Held*, that the plaintiff could not rely on the word "vacant," but was required to call for the commissioner's letter or apply to the General Land Office for a copy, and that letter would have advised him that defendant's ancestor had in 1849 entered the land on a military warrant which entitled him to the patent, and that the officers of this particular land office had been directed to "permit no entry of said tracts if they appear to be vacant until otherwise directed," which had never been done. *Held*, further, that an examination of this letter and the entry in the tract book in the county where the lands were, and a visit to the lands themselves, of which defendant was in possession, would have revealed to him the true owner. Hence, he can not claim to be an innocent purchaser, and the title which he holds under the patent subsequently issued to him, he holds in trust for the defendant.

Appeal from the Gasconade Circuit Court.—*Hon. R. Hirzel,* Judge.

AFFIRMED.

*J. W. Jamison* for appellant.

(1)  Unless defendant or his grantor, Stephan, was entitled to a patent from the Government upon the so-called location of the military bounty land warrant by John F. Stephan, as the assignee of Phillip Rausch, made on May 8, 1849, the finding and judgment should have been for plaintiff. Unless one or the other were so entitled to a patent, plaintiff, as a legal holder of the patent issued to him, can not be charged as trustee for defendant. Bohall v. Dilla, 114 U. S. 47; Smelting Co. v. Kemp, 104 U. S. 636; Sparks v. Pierce, 115 U. S. 408.

(2) Defendant must recover, if at all, upon the equity pleaded. Russell v. Whitley, 59 Mo. 196. (3) As there was no authority under the law of 1847 for the sale by the warrantee of a land warrant issued to him under its provisions, nor for the location of the same by such assignee, and as it is conceded in this case that defendant's grantor purchased the warrant attempted to be located by him from the original warrantee, Rausch, and not from his heirs, and that the attempt to locate the same at St. Louis on May 8, 1849, was some three years before the enactment of the law of 1852, which was the first authority from Congress for the sale and assignment of such warrants by the warrantee, the pretended location was absolutely void and was without any authority of law, and upon the undisputed facts the finding and judgment in this case should have been for plaintiff. (4) "With respect to the public domain, the Constitution vests in Congress the power of disposition and of making all needful rules and regulations. That power is subject to no limitations. Congress has the absolute right to prescribe the times, the conditions and the mode of transferring this property, or any part of it, and to designate the persons to whom the transfer shall be made." Gibson v. Chouteau, 80 U. S. 536. In the Act of 1847, under which the warrant in question was attempted to be located, the persons designated as having authority to locate are the warrantee and his heirs, and not his assigns. Not until the Act of 1852 had Congress designated other persons who should have the right to locate warrants, to-wit, assigns, and this Act, by its express terms, was made prospective. If it was the purpose of the Act of 1847 to authorize locations by assigns, why was so important a word omitted from the act, and why was it inserted in the Act of 1852 with a limitation to assignments thereafter made? (5) It was contended by respondent before the trial court that the register of the St. Louis Land Office, having accepted the warrant in question and issued a

certificate of location, the Government was bound by his act. It was held by the Supreme Court of the United States in the case of Gibson v. Chouteau, supra, that not even the State of Missouri could interfere with the primary right of Congress to dispose of the public domain by the enactment of statutes of limitation or otherwise. It surely can not be that a register of a United States Land Office, a ministerial officer of the Government, can lawfully usurp the powers vested in the Congress of the United States, and dispose of the public domain to such persons as he might decide were entitled to receive them. Miller v. Kerr, 7 Wheat. 1; Sheply v. Cowan, 91 U. S. 423; Moffitt v. United States, 112 U. S. 623; Filor v. United States, 76 U. S. 549; Whiteside v. United States, 93 U. S. 882.

*Kiskaddon & Meyer* and *Robert Walker* for respondent.

(1) The Act of February 11, 1847, provides that "all sales . . . made or executed prior to the issue of such warrant shall be null and void," but is silent on the subject of the assignments of such warrants after they have been issued. 9 Stat. at Large, 125, sec. 9. June 3, 1847, the commissioner of the General Land Office issued a letter of instructions to registers and receivers of local land offices, in which he states that he sends therewith a form of the land warrant, "accompanied by a form of affidavit and assignment;" that if such warrant was presented for location by an assignee "you will see that the assignment bears date subsequent to the warrant, that it is substantially in form and duly acknowledged." 1 Lester's Land Laws, 576, 579. It is evident that the commissioner was careful to instruct the officers of the local land offices to see that the assignment was made at a date subsequent to the issue of the warrant, so as to guard against assignment made prior to such issue, which the statute declared to be null and void. It ap-

pears from this that the General Land Office regarded such warrants after their issue assignable, even before the Act of 1852. The Attorney-General of the United States, in an opinion rendered June 28, 1851, expressly recognized the assignability of warrants issued under the Act of February 11, 1847. 5 Atty.-Gen. Op., 387. The appellant argues that the mere passage of the Act of March 22, 1852, is evidence that warrants issued under the Act of February 11, 1847, were not assignable. But prior to 1847, other acts providing for the issue of bounty land warrants had been passed expressly forbidding the assignment of warrants issued under such acts. 2 Stat. at Large, 729; 3 Stat. at Large, 287. The Act of March 22, 1852, made all warrants assignable which had been issued under those statutes, or under any other statute wherein the assignment of them was expressly forbidden. 10 Stat. at Large, 3. This does not indicate that warrants issued under the Act of February 11, 1847, were not assignable, but just the contrary. Having considered what the executive officers of the Government did, even before the Act of March 22, 1852, let us see how the matter stands in the courts. The land warrant of Philip Rausch, with which the land in controversy was located, was a valuable right concerning property, and independent of prohibitory legislation, assignable. Meyers v. Craft, 13 Wall. 291; Snyder v. Railroad, 86 Mo. 613; Chouteau v. Broughton, 100 Mo. 406; Brush v. Ware, 15 Pet. 93; Galt v. Galloway, 4 Pet. 331; Maxwell v. Moore, 22 How. 185. Bounties for military services have been held to be assignable. Sprague v. Frankfort, 60 Me. 253; Eichelberger v. Sifford, 27 Md. 320. Rights in and to lands of the United States, prior to the issue of a patent therefor, have repeatedly been held assignable, unless such assignment was expressly prohibited by statute. Laub v. Davenport, 18 Wall. 307; Myer v. Craft, 13 Wall. 291; Maxwell v. Moore, 22 How. 185; French v. Spencer, 21 How. 228; Bronson v. Kukuk, 3 Dill. (U. S.) 490; Webster v.

Luther, 50 Minn. 77. Considering that the Act of 1847 does not forbid the assignment of warrants, the fact that in practice they were assigned has been recognized by the courts and such assignments upheld. Dixon v. Caldwell, 15 Ohio St. 416; Holland v. Hensley, 4 Iowa 223. The right to a patent having vested in John F. Stephan, as assignee of Philip Rausch, it is equivalent, so far as the Government is concerned, to a patent, and the issue of a patent to some one else was void. Hedrick v. Railroad, 120 Mo. 540; Wickersham v. Woodbeck, 57 Mo. 61; Maguire v. Tylor, 40 Mo. 406; Hedrick v. Beeler, 110 Mo. 91. (2) Anything which ought to put a person proposing to purchase real estate upon his inquiry is actual notice. Hedrick v. Railroad, 120 Mo. 516; Major v. Bukley, 51 Mo. 231; Sensendorfer v. Kemp, 83 Mo. 588; Fellows v. Wise, 49 Mo. 350; Martin v. Jones, 72 Mo. 25; Meier v. Blume, 80 Mo. 183; Taaffe v. Kelly, 110 Mo. 136; Barrett v. Davis, 104 Mo. 561; Swisher v. Sensendorfer, 84 Mo. 104; Freeman v. Moffatt, 119 Mo. 300; Shumate v. Reavis, 49 Mo. 336.

GANTT, P. J.—This is an action of ejectment for the following lands in Gasconade county, in this State: the north half of the southwest quarter of section 3, and west half of lot number one of the northeast quarter, and the east half of lot number one of the northwest quarter of said section 3, all in township 44, range 5, west, except 25 acres, described by metes and bounds as follows: Beginning at the northwest corner of said east half of lot one of the northwest quarter of said section three and running thence east forty chains, to the northeast corner of the west one-half of said lot number one of the northeast quarter of said section three; thence south six chains and twenty-five links to a stake; west forty chains to a stake; from thence north six chains and twenty-five links to the point of beginning.

Ouster is laid as of January 10, 1899. Monthly

rents and profits are alleged to be of the value of fifteen dollars, and damages for detention $200.

The answer is, first, a general denial.

Second, that defendant's remote grantor, one John F. Stephan, had entered the lands in controversy at the United States Land Office in St. Louis, on the 8th day of May, 1849, with a military bounty land warrant numbered 30960, issued to one Phillip Rausch, and by him assigned to said Stephan; that when said entry was made the register of said land office executed and delivered to said Stephan a certificate of such entry; that by mistake or accident, the proper officers had failed or neglected to post such entry on the proper books of the said land office, and the land warrant with which the entry was made was, by mistake or accident, lost or not properly returned to the General Land Office; that said Stephan immediately after said entry, took possession of said real estate, and shortly thereafter, by warranty deed, sold and conveyed said land to one Henry Oschner, and that by several mesne conveyances said land had been conveyed to defendant; and that plaintiff, at the time he acquired the legal title to said land by a patent from the Government, had notice of the claims and equities of defendant. The prayer was that plaintiff be divested of all title acquired by him by virtue of said patent, and that the title in fee be vested in defendant, and for other proper relief.

This part of the defendant's answer plaintiff sought to have stricken out, but the court overruled his motion.

The reply was a general denial; and further, that at the date of plaintiff's entry of land said lands appeared by the records of the United States Land Office to be vacant, and that no entry had been made by anyone; that said lands are shown to be vacant and subject to entry since the year 1880 by a certified book of original entries from the United States Land Office on file in the office of the recorder of deeds of Gasconade county, Missouri, and had so appeared vacant and subject to entry

for more than five years prior to the date of the purchase of said lands by plaintiff; that defendant ànd his grantors had notice that said lands were shown to be vacant by said records of more than twenty years prior to plaintiff's entry, but that they had failed to perfect their title; that because of such failure plaintiff was induced to make his entry, and did so without notice of defendant's alleged claim, etc.

On these pleadings the case went to trial before the judge, a jury being waived.

The evidence of the substantial and material facts in the case is undisputed.

About May 8, 1849, one Philip Rausch was the holder of Military Bounty Land Warrant No. 30960, issued to him. John F. Stephan bought this land warrant from him, going before a justice of the peace in St. Louis to have the transfer made in writing and acknowledged. Stephan immediately went to the land office in St. Louis, and on said last date, with said land warrant, entered the land in controversy. The register of the land office took up the warrant, and issued to Stephan the following certificate:

"Register's Office, St. Louis, Mo., May 8, 1849. Military Land Warrant No. 30960, in the name of Philip Rausch, has this day been located by John F. Stephan, upon the north half of the southwest quarter, east half of lot No. 1, of the northwest quarter, and west half of lot No. 1 of the northeast quarter of section 3, in township 44, of range 5 west, subject to any pre-emption claim which may be filed for said land within thirty days from this date. Contents of tract located, 160 acres. The date of assignments in all cases must be given at the time they are acknowledged, and no assignment of this certificate will be regarded.

"THEO. WATSON, Register."

Confirmatory of this evidence and certificate is the following:

The tract book of lands in Gasconade county, cer-

tified to by the register and receiver of the land office at St. Louis, July 19, 1852, in connection with the description of the lands in controversy, contains the following memorandum: "Located with bounty land warrant, about April, 1849, but the name of the purchaser does not appear on our books."

Plaintiff attempts to meet this evidence by a subsequent memorandum made October 9, 1880, in red ink on the same book by the register and recorder of the Boonville Land Office to which the St. Louis Land Office books seem to have been transferred, as follows: "October 9, 1880—Erroneous—The tracts appear vacant on the record. R. and R."

It further appears rather indefinitely, by the testimony of officers of the Boonville Land Office, that on the books of the office in connection with the description of this land, some pencil memorandum had been made and afterwards erased.

Within three or four months after the entry of the land by Stephan on May 8, 1849, he went into possession and cleared about two acres.

On October 11, 1850, Stephan, by warranty deed, conveyed the land to Henry Oschner. The deed expressly refers to the entry aforesaid, giving the number of the warrant with which it was made, and there is undisputed evidence that the certificate of entry hereinbefore set out was delivered to Oschner with the deed. This deed was filed for record and recorded October 12, 1850.

The other conveyances, which transferred the land to defendant, were a last will of Henry Oschner, duly probated, and a warranty deed from his devisee to defendant. The last will was probated in Gasconade county, Missouri, October 2, 1875. The deed from the devisee to defendant was recorded in the same county March 19, 1885.

The application of plaintiff for a patent was made

May 15, 1898, and the patent issued on said application is dated December 17, 1898.

From the time that Stephan went into the possession of the land in the autumn of 1849 until this action was commenced, Stephan and his grantees were in possession of the land, had about sixty acres of it cleared and under cultivation, a good dwelling house on the land in which he lived, and the necessary outbuildings for the use of a farmer.

It also appeared on the cross-examination of John Stephan, a son of John F. Stephan, that about the year 1875 Mr. Oschner had written to him requesting an affidavit touching his knowledge of the entry made by his father, but that he had not done anything in the matter.

A letter of the commissioner of the General Land Office at Washington, D. C., addressed to the register and receiver of the land office at Boonville, Missouri, was also read in evidence. The letter is dated May 22, 1867. By this it appears that the duplicate certificate issued to Stephan had been sent to the General Land Office, but that by the records there the land seemed to be vacant. It directed the officers at Boonville to search their records for any evidence of location, and to "*permit no entry of said tracts, if they appear vacant, until otherwise directed.*" The original of this letter could not be found in the Boonville office, and a certified copy of it was read; but on the books at Boonville, in connection with a description of this land, was a memorandum in red ink, as follows: "*Vacant, see Comms. letter, May 22, 1867.*" There was no evidence that the order of the commissioner of the General Land Office contained in his letter of May 22, 1867, had ever been recalled.

It was admitted at the trial that plaintiff had never paid any taxes on this property, and that defendant and those under whom he claims title had paid all taxes and had been in possession claiming title since 1850.

Appellant, in his statement of the case, calls attention to the fact that twenty-five acres of the land which

was not sued for, as appears by the petition, although covered by his patent, is included in the judgment, and that by said judgment plaintiff is divested of title to said twenty-five acres, and the same is vested in defendant.

There is nothing in the record, however, which indicates that the attention of the court below was called to this obvious clerical misprision, and respondent contends that this error is not sufficient to warrant a reversal, but that the description may, under the statute, be corrected in this court.

At the conclusion of the evidence, numerous instructions were asked by plaintiff, all of which were refused.

Defendant asked one instruction, which the court refused.

On the equitable defense the court found the issues for defendant and rendered judgment in accordance with the prayer of the answer.

I.   The fundamental proposition advanced in this case by the plaintiff is that a bounty land warrant issued under the act of Congress of February 11, 1847, was not assignable until the act of Congress of March 22, 1852, because the right of defendant to have plaintiff declared the trustee of defendant and to require a conveyance of the legal title to the lands in controversy, depends upon defendant's ability to show that as assignee of Military Land Warrant No. 30960, issued to Philip Rausch, May 8, 1849, he was entitled to locate the one hundred and sixty acres and receive a patent from the Government of the United States.

In Bohall v. Dilla, 114 U. S. 47, the Supreme Court of the United States announced the doctrine which commends itself as equitable and just, that "to charge the legal holder of a patent from the United States as trustee of another and to compel him to transfer the legal title, the claimant must present such an equity as will show that he himself was entitled to a patent from the Government, and in consequence of some erroneous ruling of the officers of the Land Department of the law ap-

plicable to the facts found, it was refused to him. It is not sufficient to show that there may have been error in adjudging title to the patentee. It must appear that by the law properly administered the title should have been awarded to claimant." [Smelting Co. v. Kemp, 104 U. S. loc. cit. 636; Sparks v. Pierce, 115 U. S. loc. cit. 408.]

Unless, therefore, defendant has shown that his remote grantor, John F. Stephan, was entitled to a patent as the assignee of Military Land Warrant No. 30960 and his location thereof on the lands in suit, he is not in a position to challenge the patent issued to said lands by the Government in 1898, as he would be a stranger to plaintiff's title, and it would be no concern of his that the Land Department had erroneously granted plaintiff a patent. Moreover, the answer of defendant relies upon the assignment of this warrant and the entry by virtue thereof by John F. Stephan, and he must defeat plaintiff's legal title through this equity thus pleaded or not at all. [Kennedy v. Daniels, 20 Mo. 104; Russell v. Whitely, 59 Mo. 196.]

With this preliminary statement of the issue, we come to the consideration of the very interesting contention that a military land warrant under the Act of February 11, 1847, was not assignable by the soldier to whom it had been issued by the Government for his services in the Mexican War. To fully grasp the insistence of plaintiff that such warrant was not assignable prior to the Act of March 22, 1852, which expressly authorized the assignment of all land warrants (10 U. S. Stats. at Large (1851-55), pp. 3 and 4), we quote from the Act of 1847.

Section 9 provides that: "Each non-commissioned officer, musician or private, enlisted or to be enlisted in the regular army, or regularly mustered in any volunteer company for a period of not less than twelve months, who has served or may serve during the present war with Mexico, and who shall receive an honorable discharge, or who shall have been killed or died of

wounds received or sickness incurred in the course of
such service, or who shall have been discharged before
the expiration of his term of service in consequence of
wounds received or sickness incurred in the course of
such service, *shall be* entitled to receive a certificate or
warrant from the War Department for the quantity of
one hundred and sixty acres, and which may be located
by the warrantee or his heirs at law at any land office
of the United States, in one body, and in conformity to
the legal subdivisions of the public lands, upon any of
the public lands in such district then subject to private
entry; and upon the return of such certificate or war-
rant, with evidence of the location thereof having been
legally made, to the General Land Office, a patent shall
be issued therefor." It is further provided that "all
sales, mortgages, powers, or other instruments of writ-
ing, going to affect the title or claim to any such bounty
right, made or executed prior to the issue of such war-
rant or certificate, shall be null and void to all intents
and purposes whatsoever, nor shall such claim to bounty
right be in anywise affected by, or charged with, or sub-
ject to, the payment of any debt or claim incurred by the
soldier prior to the issuing of such certificate or war-
rant."

It is asserted by plaintiff that under the provisions
of this act there is absolutely no authority for the sale or
assignment of the land warrant issued in pursuance of
it.

The argument of plaintiff may be epitomized as fol-
lows:

The warrants issued under the act were to be lo-
cated by the warrantee or his heirs, but in the event of
his death the warrant might be sold for the benefit of his
family; but it is nowhere provided in the act that the
soldier himself could sell it, and all sales prior to the
issue of the warrant are rendered null and void; that it
was not intended he should have the right to sell. It

Vol 176 mo—30

was intended to keep them out of the hands of·speculators. In a word, because the act does not in express terms authorize the location of a warrant by the soldier or his heirs, *or his assigns,* an assignment by him of his warrant is absolutely void in the absence of an enabling act which plaintiff asserts was first passed in 1852.

The construction placed upon the Act of 1847 by the commissioner of the General Land Office and the practice of that department is entitled to great consideration, in the absence of an affirmative decision by the Supreme Court holding that construction erroneous.

By reference to 1 Lester's Land Laws, 576, 579, it will be seen that the commissioner of the General Land Office on June 3, 1847, in his instructions to the registers and receivers of the United States Land Office, gave a contemporaneous construction of the Act of 1847, in which he clearly recognized the right of the holder of the warrant to assign it, and directed that the registers and receivers, when a warrant was presented by an assignee for location, should see to it that the assignment bore date subsequent to the warrant, and gave specific directions as to the proof of the assignment by acknowledgment before an officer or power of attorney properly authenticated.

In the very same month the Attorney-General of the United States fully recognized that an assignee was entitled to his patent. [5 Att.-Genl. Opinions, pp. 387, 388.]

Speaking of the respect which these acts of these high officials of the Government should receive, Judge Cooley, in Johnson v. Ballou, 28 Mich. loc. cit. 384, in a similar case, says, "These opinions of very eminent lawyers are worthy of high consideration, especially as when giving them they were the official advisers of the Government, and their advice was accepted and acted upon by the Department of the Interior. The Government has thus given a practical construction to its *own grants,* which the State authorities should accept and

follow, unless it is found that the proper judicial author-
ity of the Federal Government has reviewed and found
it erroneous.'' [Sutherland on Stat. Construction, sec.
309.]

The very opposite views urged by contending
counsel in this case clearly bring it within the first sit-
uation in which the courts resort to contemporary con-
struction by official usage, to-wit, that the statute is
more or less of doubtful meaning. [U. S. v. Tanner,
147 U. S. 661.]

Again the practice then adopted appears to have
been uniform and has existed for a half century and no
decision of the Federal courts condemning it has been
called to our attention. It must be borne in mind that
the officials of the General Land Office were required to
inaugurate a system for carrying out the beneficent
policy of the Government. The Government had pro-
vided a bounty to those who had worthily worn its uni-
form and fought its battles. The commissioner of the
General Land Office in his directions shows that he has
carefully digested the act and he must be presumed to
have carefully weighed all its provisions. He reached
the conclusion that a soldier after receiving his warrant
could sell and assign it, and that his assignee could lo-
cate the land for which it called, and the act having thus
been interpreted, doubtless many did assign their war-
rants. When it is considered that he was the represen-
tative of the Government, and that his construction could
injure no one but the Government, this practical con-
struction, contemporaneous with the Act of 1847, so long
acquiesced in and never overturned by the Judicial De-
partment, is entitled to great weight and our most seri-
ous consideration, when the rights of those who relied
upon it are jeopardized by assailing the construction of
the Land Department as unsound.

We think it clearly appears that the General Land
Office regarded such warrants as assignable before the

Act of 1852 made all such warrants assignable by express enactments.

But it is urged that the very fact that in 1852 Congress authorized all land warrants to be assigned is conclusive evidence that prior to that act they were not assignable. We do not think this is a necessary inference by any means.

The laws of this State and of our sister States abound in statutes which the courts have adjudged to be merely declarative of the common law. Such statutes have often been enacted to remove all questions that the common law still obtains, and it may easily be conjectured that a doubt had been raised whether the warrants under the Act of 1847 were assignable, and the Congress by the Act of 1852 intended to set that doubt at rest. Statutes are read and construed in the light of the common law. "Rules of interpretation and construction are derived from the common law, and since that law constitutes the foundation and primarily the body and soul of our jurisprudence, every statutory enactment is construed by its light and with reference to its cognate principles." [Sutherland on Stat. Cons., sec. 289.]

Looking now at the act itself, when Philip Rausch obtained his land warrant, he had secured a most valuable property right. It is too plain for discussion that it would have passed to his heirs or personal representatives in the absence of specific direction given in the statute as to its devolution in the event of his death. Such a right in the holder of the warrant in the absence of an express prohibition of his right of alienation was assignable. The act contains no restriction on the warrantee to assign his certificate except that contained in the words "and all sales, mortgages, . . . made or executed *prior to the issue of such* warrant or certificate shall be null and void," etc. Keeping in mind the general right to assign a property right, and the restriction as to sales of those warrants prior to their issue, it seems perfectly clear that it was not the intention of

Congress to prevent their assignment *after* their issue. *"Expressio unius exclusio alterius est."* We may appropriate the language of the Supreme Court of the United States in Myers v. Croft, 13 Wall. loc. cit. 297, to-wit: "If it had been the purpose of Congress to attain the object contended for, it would have declared the lands themselves unalienable until the patent was granted. Instead of this, the legislation was directed against the assignment or transfer of the right secured by the act, which was the right of pre-emption, leaving the pre-emptor free to sell his land after the entry, if at that time he was, in good faith, the owner of the land." That act was much more drastic in its terms than the one before us, and yet the court construed the act so as to let him sell his right before receiving his patent. Here the only inhibition is, he shall not sell or assign his right before receiving his warrant. After he gets it, there is no restraint upon his alienation in the act.

As to the point made that the act provides that the warrant may be located by the warrantee or his heirs at law, we do not think it affects the question of the assignability of the warrant. The mere designation of the holder and his heirs as entitled to locate the warrant in no manner negatives or restricts his power of alienation.

The right to assign land warrants was so fully recognized by Congress that wherever it intended to prevent its exercise, it used unmistakable language. [2 U. S. Stats. at Large (1799-1813), 729; 3 U. S. Stats. at Large (1813-1823), 286-287; Lamb v. Davenport, 18 Wall. 307; Myers v. Croft, 13 Wall. 291; Dixon v. Caldwell, 15 Ohio St. 412; Holland v. Hensley, 4 Iowa 222.]

Our conclusion is that the certificate or land warrant of Philip Rausch was assignable in the absence of a restriction in the act granting him the same and that there are no words which forbade its sale and alienation by him after the warrant issued to him, and by its assignment John F. Stephan became the owner thereof

and entitled to enter or locate the land in controversy in his own name. Hence, we answer the first contention against the plaintiff and hold that when the register of the land office at St. Louis took up his warrant and issued him a certificate of location of the lands in suit, he was entitled to have the patent thereof issued to him, and, hence, the defendant as his remote grantee is entitled to maintain his defense to have plaintiff declared to hold the legal title in trust for him, unless it further appears that plaintiff is an innocent purchaser for value and without notice.

II. When John F. Stephan located his warrant and received his certificate of entry and purchase, he was required by law to deliver up his warrant to the register of the land office at St. Louis, and this the evidence shows he did. He could not control the officers of the land office, neither is he responsible for their neglect of duty in failing to report his location to the General Land Office at Washington City. The equitable title of the United States passed to the defendant's remote grantor, Stephan, and the Government had no right to patent it to plaintiff. The right to patent once vested as respects the Government is equivalent to a patent. [Wickersham v. Woodbeck, 57 Mo. 59; Wirth v. Branson, 98 U. S. 118; Stark v. Starrs, 73 U. S. 402.]

While the State has no right to control the primary disposition of the public lands belonging to the United States, yet when the title passes from the Government, the State courts have jurisdiction to determine the controversy between the adverse claimants thereto. [Magwire v. Tyler, 40 Mo. 406; Hedrick v. Beeler, 110 Mo. 91; Carman v. Johnson, 20 Mo. 108.]

What, then, are the further equities of the defendant? Stephan having bought and received an assignment of Rausch's warrant, duly located it and turned it over to the register at St. Louis, and received his certificate of location, and went into actual possession of the land in 1849, and made improvements thereon, claiming

title under his certificate. The evidence shows a continuous possession in defendant and his grantees since 1849. Defendant had built a dwelling house on the land in which he lived and also other necessary buildings, and had about thirty acres of the land cleared and in cultivation, and he and his grantors had paid the taxes on the land ever since the year 1850.

When the plaintiff made his entry and obtained his patent in 1898 the defendant was living on the land and in open and notorious possession of it. But plaintiff insists that the land appeared vacant on the books of the United States Land Office at Boonville when he made his application and paid his money in 1898, and obtained his patent.

In the tract book in the recorder's office in Gasconade county in which the land is situated, the following memorandum made and certified by the register of the land office at St. Louis July 19, 1852, appears: "Located with bounty land warrant about April, 1849, but the name of the purchaser does not appear on our books," and in the Boonville Land Office, as appears by the evidence of Herman Fickin, a clerk in that office, appears the following memorandum: "Vacant. See Comm's letter May 22, 1867." This memorandum was in red ink, and appeared in the tract book at the time plaintiff made his entry in 1898.

This witness testified he looked for the commissioner's letter of 1867, but could not find the same in the 1867 bunch.

Having accounted for his inability to produce the original of the commissioner's letter of 1867, defendant offered and read in evidence a certified copy thereof from the Department of the Interior, at Washington, D. C.:

"Department of the Interior, General Land Office, Washington, D. C., May 22, 1867.

"Register and Receiver, Boonville, Missouri:

"Gentlemen:—A duplicate certificate has been re-

ceived at this office for a location purporting to have been made at St. Louis, Mo., May 8, 1849, by John F. Stephan, with bounty land warrant certificate No. 30960, Act of 1847, on the north half of the southwest quarter, east half of lot one of northwest quarter, and west half of lot one of northeast quarter of section 3, T. 44, R. 5, W. The register's returns of locations at St. Louis, in May, 1849, contain no such location as that described in the certificate, nor does it appear that warrant certificate No. 30960 has ever been returned to this office as located. Moreover, the tracts described in the certificate appear vacant upon our tract books. You will, therefore, carefully examine the plat and records of the late St. Louis office and report the condition of said tracts as shown by such plat and records, and permit no entry of any of said tracts, if they appear vacant, until otherwise directed. I am very respectfully,

"Your Ob't Serv't,

"Jos. J. WILSON, Commissioner."

In pursuance of this letter the tract was marked on the tract book with the red letters above noted.

So that while the register and receiver at St. Louis had neglected to return the Rausch warrant, No. 30960, to Washington to the General Land Department, it does appear that in 1867 the department was advised of the location by John F. Stephan, the number of the warrant, the act under which it was issued, and the exact description of the land on which it was located. Evidently the duplicate had been sent in for the purpose of obtaining the patent. Thereupon, all this information was furnished to the land office at Boonville, Missouri, and the land marked, "See Commr's letter May 22, 1867." When plaintiff went to the land office at Boonville to enter this land, with these red letters staring him in the face, he could not depend wholly on the word "*vacant*," but was required to call for the commissioner's letter of 1867. If he had called for it and the incumbent of the office could not find it, prudence required that he should

apply to the department at Washington for a copy, and when he received the copy he would have been advised that on May 8, 1849, at St. Louis, John F. Stephan had located the lands with Land Warrant No. 30960, and that the officers of the Boonville office had been directed to "permit no entry of said tracts if they appear to be vacant *until otherwise directed.*" Having ascertained, then, that Stephan claimed to have entered the land, he could have gone to Gasconade county, and examined the tract book certified to the recorder by the register and receiver at St. Louis before the records were consolidated at Boonville, and there he would have found that on July 16, 1852, they had certified that some one had located these lands about April, 1849, but his name did not appear on the books.

Starting with Stephan the records of deeds would have shown a straight line of conveyances to defendant. A visit to the lands would have disclosed defendant in possession, and inquiry would have developed that possession had been maintained for fifty years. In view of all these circumstances and facts and the absolute failure of plaintiff to testify that he had no knowledge or information of defendant's occupancy of the lands in suit, it must be held that he is chargeable with notice thereof and that he was bound in good faith to follow up the facts indicated by the possession of defendant for fifty years and by the call for the letter of the commissioner of the General Land Office, at Washington. These facts were amply sufficient to put him upon inquiry and bring home notice to him of the prior entry by Stephan. [Vaughn v. Tracy, 22 Mo. 417; Leavitt v. La Force, 71 Mo. 353.]

In Freeman v. Moffitt, 119 Mo. 280, it was said that if the purchaser "had not ignored all the ordinary rules of prudence, he would have learned of the true state of the title and that Wilkinson was the owner. The fact of Moffitt's possession put him upon inquiry, and he should not have blindly shut his eyes to the

truth as it existed, and the court should have so declared.''·

So we say here. It is a most unusual proceeding for one to purchase real estate without seeing it or making inquiries concerning its character, whether timber or prairie land; whether cultivated or uncultivated; whether any one is in possession or vacant. This land was attempted to be entered by plaintiff in 1898. It was located in the very heart of Missouri. Every probability was that if it was not utterly worthless it had been entered and was occupied. Outside of the significant call for an examination of the commissioner's letter, which would have disclosed defendant's prior entry, the fact of an unbroken possession for fifty years would have been disclosed by the most ordinary diligence of a trip to Gasconade county or a letter of inquiry. Can a purchaser fail to use these simple precautions and then assert in a court of conscience that he is an innocent purchaser and entitled to take from an equitable owner in possession the home on which he and his grantors have resided openly for fifty years and have enhanced by their labor and means?

We think most clearly he can not, and that he must be held to be chargeable with actual notice, which does not mean direct evidence that he actually knew of defendant's prior entry, but that the possession and the facts and circumstances coming to his knowledge were such as to put a man of ordinary circumspection upon inquiry, and reasonable inquiry would have disclosed defendant's prior entry and superior equity. [Morrison v. Juden, 145 Mo. 298; Conn. Mut. v. Smith, 117 Mo. 292; Maupin v. Emmons, 47 Mo. 304.]

III. In some way the decree of the court erroneously included the twenty-five acres excepted in the petition. This was a perfectly obvious mistake. Plaintiff had not sued for this twenty-five acres, neither had defendant claimed it. It was a mere clerical error and as the answer of defendant states an equitable defense

and prays for affirmative relief, it is entirely competent for this court to correct this mistake at this time, without remanding the cause for that purpose only.

In view of the whole evidence, the judgment of the circuit court is in all things affirmed, save and except so much thereof as inadvertently vested the title to the twenty-five acres, described by metes and bounds in plaintiff's petition, in defendant. As that portion of the decree is an apparent clerical error, it will be stricken out, and the decree so corrected, is affirmed. All concur.